1

2

3

4

5

6

7

8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  PHAY ANOUSAYA,                              No. CIV S-05-0301-GEB-CMK

12               Plaintiff,

13        vs.                                   FINDINGS AND RECOMMENDATIONS

14  MICHAEL J. ASTRUE,[1]
    Commissioner of Social Security,

15
                 Defendant.

16
    _____/

17

18               Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security pursuant to 42 U.S.C. §

20  405(g). Pending before the court are plaintiff's motion for summary judgment (Doc. 24) and

21  defendant's cross-motion for summary judgment (Doc. 27).

22  / / /

23  / / /

24  _____

25        [1]      Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is
    substituted for his predecessor.  The Clerk of the Court is directed to update the docket to reflect
26  the above caption.

1

# I. BACKGROUND

Plaintiff applied for disability insurance benefits on March 31, 2003, based on disability.  In his applications, plaintiff claims that his impairment began on February 28, 2003. In his motion for summary judgment, plaintiff states that he suffers from the following impairments:  (1) hypertension; (2) traumatic arthritis; (3) degenerative joint disease of the left hip with hip pain; (4) severe chronic headaches; (5) dizziness; (6) gout; (7) blurred vision; (8) cervicogenic pain; (9) low back pain; (10) pain in the lower extremities; (11) possible carpel tunnel syndrome; (12) nausea; (13) numbness in the lower extremities; (14) language barriers; and (15) neck pain.   Plaintiff alleges that these impairments make it impossible for him to do work of any kind at any exertional level.  Plaintiff is a United States citizen born March 10, 1951, in Laos, with the equivalent of a high school education.

## A.   Summary of the Evidence

The ALJ summarized the medical record as follows:

> The record shows that the claimant received routine care by Werawoot Patra, M.D., for hypertension and left hip pain from October 2000 through April 2003.  Treatment records show that he was seen every two or three months for review and refill of his medication.
>
> The claimant underwent an internal medicine consultative examination by Satish Sharma, M.D., on May 24, 2003.  His chief complaints were left hip pain, neck pain, and low back pain.  He also had elevated blood pressure at 180/100.  Physical examination findings revealed tenderness in the muscles surrounding the lumbar and cervical spine.  There was no spasm.  Straight-leg raising was normal.  There was pain with flexion of the left hip.  The claimant had a limp on the left.  Motor functioning, strength, and reflexes were normal.  Dr. Sharma stated that the claimant could occasionally bend and stoop.  He could stand and walk six hours in an eight-hour work day with normal breaks.  There were no other limitations.
>
> The claimant underwent a psychological consultative examination by Richard Kahler, Ph.D., on June 4, 2003.  The claimant's primary complaint was headaches and his physical disorders.  He also noted that he had a poor memory and difficulty concentrating.  Upon examination, he was appropriately dressed and groomed.  He appeared in no distress.  He was calm, cooperative, and compliant.  Psychological testing was performed, but the results were considered invalid due to language barriers.  Although the claimant could speak some simple English, it was

not sufficient to perform testing tasks, and interpretation was too difficult. He showed no signs or symptoms of a psychotic disorder.  The historical information provided was somewhat contradictory and incomplete.  The claimant had no history of psychiatric contact, evaluation, or treatment. He was taking no medication for anxiety or depression.  There was no reported history of any treatment for any emotional, mental, or psychiatric symptoms of any kind.  The claimant interacted in a quiet and reserved manner.  He said that he worked as a baker, and quit due to headaches.  he stated that he watched television most of the day.  He did some cooking and household chores.  He was alert and made good eye contact.  He was adequately oriented.  There were no outward signs of a mood disorder. There was no direct evidence of a severe memory or concentration problem.  Dr. Kahler diagnosed an adjustment disorder with mixed emotional features.  He indicated that there were no major psychiatric problems or symptoms.  He said that cognitively and intellectually, he could still function close to his previous level.

The claimant began receiving treatment at Shasta Primary Care Clinic[2] in June 2003.  It was noted that he was from Laos but spoke some English. he was seen every one to two months in 2003 and 2004 for routine treatment for left hip pain, hypertension, and gout.  He was also seen for blood in his urine, but this was determined to be of no clinical significance.  In July 2003, the claimant reported some anxiety symptoms. however, he was not experiencing sleep disturbance, and there is no mention of anxiety in later treatment records.

Treatment records from Shasta Clinic[3] through March 2004 show that the claimant underwent various changes in medication for hypertension, gout, and pain.  X-rays of his hip showed traumatic arthritis from an old injury, and some mild degenerative joint disease.  In September 2003, the claimant reported left arm numbness.  It was found that he had a shoulder strain, and a trigger point injection was done with good results.  Later that month the claimant reported extensive pain, but clinical findings showed full range of motion with pain at only the extremes of motion.  The claimant continued to have some problems related to gout, and his hypertension was not well controlled.  However, it was determined that he was not taking his medication.  He was educated regarding how to take his medication.

In addition to the evidence summarized by the ALJ, the record contains a

psychiatric review technique form completed by Donald R. Walker, M.D., in July 2003, and a

---

[2]     The certified administrative record contains records from Shasta Community Health Center, not Shasta Primary Care Clinic.  The index to exhibits accompanying the record lists as Exhibit 4F records from "Shasta Primary Care."  A review of those records, however, reveals that they are from Shasta Community Health Center.

[3]     Shasta Community Health Center.

physical residual functional capacity assessment completed by Corazon C. David, M.D., in June 2003.  Drs. Walker and David are both agency consultative physicians.  Dr. Walker concluded that plaintiff had an affective disorder and an anxiety-related disorder.  In particular, Dr. Walker noted some depressive syndrome characterized by decreased energy, sleep disturbance, and difficulty concentrating.  Dr. Walker also suggested generalized anxiety accompanied only by motor tension.  He did not believe that these were severe impairments.

In her physical residual functional capacity assessment, Dr. David concluded that plaintiff could occasionally lift up to 20 pounds and frequently lift up to 10 pounds.  She concluded that plaintiff could stand, sit, and/or walk about 6 hours in a normal work day.  Dr. David did not find any limitations for pushing or pulling, other than the weight restrictions for lifting.  As to postural limitations, Dr. David stated that plaintiff could frequently climb and balance, but could only occasionally stoop, kneel, crouch, or crawl.  Dr. David did not note any manipulative, visual, communicative, or environmental limitations.  Finally, Dr. David indicated that there were no treating or examining source materials which contradict her assessment.

The record also contains two questionnaires concerning plaintiff's daily activities.  One is a third-party statement provided by plaintiff's daughter.  The other is plaintiff's own statement.[4]  These statements reflect that plaintiff spends a typical day taking care of his 5-year-old grandson, walking outside, watching television, cooking for the family, and gardening.  Plaintiff also cleans the house in the mornings.  The statements also reflect that plaintiff experiences pain when on his feet "for a long time."  Plaintiff also cares for two children when "they're back from school."  As to community activities, the statements reflect that plaintiff is active in the Laotian community and, sometimes, he helps out with the Lao New Year festivities.

/ / /

/ / /

---

[4]     Based on a comparison of the handwriting on the two statements, it appears that both were completed by plaintiff's daughter.

**B.**  **Procedural History**

Plaintiff's claims were initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on July 14, 2004, before Administrative Law Judge ("ALJ") L. Kalei Fong.

In her August 24, 2004, decision, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision;

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

3.  The claimant's hypertension, traumatic arthritis, degenerative joint disease of the left hip, and intermittent gout are considered severe based on the requirements in the Regulations . . . ;

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix A, Subpart P, Regulation No. 4;

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision;

6.  The claimant has the following residual functional capacity:  light work that can be performed with a limited command of the English language;

7.  The claimant is unable to perform any of his past relevant work;

8.  The claimant is an individual closely approaching advanced age;

9.  The claimant has a high school (or high school equivalent) education;

10.  Transferability of skills is not an issue in this case;

11.  The claimant has the residual functional capacity to perform a significant range of light work;

12.  Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.11 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform; examples of such jobs include work as a weight tester . . . and food service checker . . . ; and

13.  The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision.

1   Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not

2   entitled to benefits.  After the Appeals Council declined review on December 11, 2004, this

3   appeal followed.

4

5                       **II.  STANDARD OF REVIEW**

6           The court reviews the Commissioner's final decision to determine whether it is:

7   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

8   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

9   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520,

10   521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

11   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

12   including both the evidence that supports and detracts from the Commissioner's conclusion,

13   must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986);

14   Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the

15   Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See

16   Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the

17   administrative findings, or if there is conflicting evidence supporting a particular finding, the

18   finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th

19   Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation,

20   one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas

21   v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

22   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

23   (9th Cir. 1988).

24   / / /

25   / / /

26   / / /

# III.  DISCUSSION

In his motion for summary judgment, plaintiff argues:  (1) the ALJ rejected the opinions of the treating and examining doctors without providing specific and legitimate reasons for doing so; (2) the ALJ improperly rejected plaintiff's testimony as not credible; (3) the ALJ failed to consider all of plaintiff's impairments in determining plaintiff's severe impairments; and (4) the ALJ failed to include all of plaintiff's limitations in the hypothetical question posed to the vocational expert.

## A.    Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See

1   Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough

2   summary of the facts and conflicting clinical evidence, states her interpretation of the evidence,

3   and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent

4   specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or

5   examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining

6   professional, without other evidence, is insufficient to reject the opinion of a treating or

7   examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to

8   any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d

9   1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported

10  opinion); see also Magallanes, 881 F.2d at 751.

11          The focus of plaintiff's argument concerning the medical opinions is on the ALJ's

12  summary of the medical evidence.  Specifically, plaintiff alleges that the ALJ mischaracterized

13  the evidence and, as a result, improperly rejected the opinions of the treating and examining

14  physicians.  Plaintiff challenges the ALJ's characterization of the medical evidence concerning

15  the following conditions:  (1) hypertension; (2) gout; (3) back pain; (4) hip problems; and (5)

16  neck/cervicogenic pain and related problems, including headaches, dizziness, nausea, and

17  blurring of vision.[5]  According to plaintiff, the ALJ failed to properly consider the evidence from

18  Shasta Community Health Center ("SCHC"), a treating source, and Dr. Sharma, a consultative

19  examining source.

20  / / /

21  / / /

22  / / /

---

23          [5]      Dr. Sharma's report indicates that these complaints are all related.  Specifically,
24  Dr. Sharma notes plaintiff's complaints of neck pain which cause headaches and adds:

25          He describes these headaches as . . . associated with nausea at times. . . .
            At times when he gets a headache, he also becomes dizzy and sometimes
26          has blurring of vision with it.

1          1.     Hypertension

2          Plaintiff argues:

3                  . . . First, the ALJ rejected the findings of Mr. Anousaya's treating
          physician regarding the status of his hypertension.  Although the ALJ
4          determined that Mr. Anousaya's hypertension was a "severe" impairment,
          he dismissed the impact of this impairment incorrectly noting that it had
5          "not resulted in end organ damage or other complications."  In fact, Shasta
          Community Health Center . . . found that Mr. Anousaya's hypertension
6          was not subject to good control (TR 142, 129, 178), even with the proper
          use of four hypertension medications . . . .  Nevertheless, the ALJ failed to
7          even mention the fact that Mr. Anousaya's hypertension was not
          amendable to good control – a very serious complication . . . and an
8          implicit rejection of the findings of his treating physician without
          comment or explanation.

9

10    The premise of plaintiff's argument is his statement that, even with the use of four hypertension

11    medications, this condition was not under good control and that this constitutes a complication

12    not considered by the ALJ.

13          Plaintiff misreads the record.  As the ALJ stated in his summary of the SCHC

14    records, plaintiff was not taking his medication.  Specifically, a November 4, 2003, progress note

15    indicates that plaintiff was still not taking his hypertension medication properly.  The physician

16    stated:  "I think half the problem is we don't know what he is taking and he doesn't know what

17    he is taking, and he's taking them in a random pattern."  At this time, the plan was to "[s]tart all

18    fresh with medicines."  A March 18, 2004, progress note indicates as follows:

19                  . . . [Plaintiff] . . . has hypertension and doesn't take that
          [medication] like he should.  [¶] Noncompliance with medications for . . .
20          hypertension.

21    Therefore, the court concludes that the ALJ did not err in characterizing plaintiff's hypertension

22    based on the SCHC records.  In fact, the ALJ appears to have agreed with the SCHC treating

23    physician who stated that he believed the problem was that plaintiff was not taking his

24    medication properly.

25    / / /

26    / / /

2.    <u>Gout</u>

Plaintiff argues that the ALJ erred in characterizing plaintiff's gout as intermittent and controlled with medication.  The court disagrees.  With respect to plaintiff's gout, the following exchange between plaintiff and the ALJ took place at the hearing:

> Q:    I want to know when was the last time he had a gout episode or injury or gout attack?
>
> A:    I already did told this, approximately five to six years.
>
> Q:    Ago?  I'm sorry?
>
> A:    Yes, five to six years ago. . . .
>
> * * *
>
> Q:    Okay.  And then you were put on medication . . . .
>
> A:    Yes, yes, I have the medication.
>
> Q:    Has the medication helped to kind of control the gout attack?
>
> A:    When it hurts, yes, it helps.  After go to work then the gout come back.
>
> Q:    Okay.  I'm talking about after you stop work in 2000 – have you had any attacks since you stopped working in 2003?
>
> A:    Yes, I have, a few attacks.

And, as with his hypertension problem, it appears that plaintiff was not taking his gout medication.  The March 18, 2004, SCHC progress note states:  "[Plaintiff] does have gout and . . . he doesn't take his gout medication very often."

Based on plaintiff's hearing testimony, the court finds that the ALJ did not err in characterizing plaintiff's gout as intermittent.  Plaintiff testified that the last attack was five to six years prior to the hearing and that, after 2003, he only had a "few attacks."  Further, the SCHC records demonstrate that plaintiff's gout was stable and under good control with proper use of medication.

/ / /

3.    Back Pain

As to plaintiff's complaints of back pain, the ALJ stated:

> The claimant has also alleged back pain . . ., but the record provides
> evidence of only very intermittent complaints and virtually no clinical
> findings or treatment other than medication for [this] complaint.

Plaintiff argues that this finding is inconsistent with Dr. Sharma's opinion and observations

made by his treating physicians at SCHC.  Again, the court disagrees.  As to plaintiff's back

complaints, Dr. Sharma made the following observations upon physical examination:

> There is tenderness to palpation of the lumbar spine and paraspinal area
> with pain on forward flexion at 70 degrees.  No paraspinal muscle spasm
> noted.  Straight-leg raising is negative bilaterally.  Lasegue's sign is
> negative.

From this it is clear that both tests performed – straight-leg raising and Lasegue's – were

negative.  This is consistent with the ALJ's characterization of plaintiff's back complaints.  As to

observations made by SCHC doctors, plaintiff focuses on a progress note from September 26,

2003.  Plaintiff, however, points the court to the portion of the progress note describing

plaintiff's subjective complaints and symptoms.  As to objective findings based on examination,

the progress note states:

> On examination of his hip, he demonstrates a full range of motion without
> pain, with the exception at the maximum of abduction he gets some
> discomfort posteriorly.

These objective findings relate to plaintiff's hip, not his back.  Plaintiff does not point to any

other evidence suggesting a severe impairment based on back pain and, after reviewing the entire

record, the court cannot find any evidence contradicting the ALJ's finding.

4.    Hip Problems

Plaintiff argues that, although the ALJ concluded that plaintiff's degenerative

joint disease of the left hip and traumatic arthritis were severe impairments, "the ALJ . . . failed

to recognize and acknowledge the true severity of Mr. Anousaya's hip condition as documented

in the medical records from his treating provider."  Plaintiff also argues that the ALJ's

11

characterization of his hip problems is inconsistent with Dr. Sharma's findings.

Plaintiff states that the ALJ concluded that his degenerative joint disease was only "mild." This is not an accurate reading of the hearing decision. While the ALJ noted in her summary of the medical evidence that SCHC records noted that "x-rays of his hip showed . . . some mild degenerative joint disease," in her analysis and again in her ultimate conclusions, the ALJ determined that plaintiff has ". . . traumatic arthritis and degenerative joint disease of the left hip" and that these impairment are severe. Thus, it appears that, contrary to plaintiff's position, the ALJ actually attributed more severity to plaintiff's hip problems than would be suggested by the x-rays.[6]

### 5.   Neck/Cervicogenic Pain and Related Problems

Plaintiff argues that the ALJ was "incorrect . . . in stating that Mr. Anousaya's headache and neck pain conditions lacked support from the record." Specifically, plaintiff contends that Dr. Sharma's report supports a finding of a severe impairment based on neck pain and headaches. In Dr. Sharma's report, he noted plaintiff's subjective complaints of neck pain which radiates to the upper extremities. Dr. Sharma also noted:

> The patient says anytime he bends his neck or lifts anything, he has neck pain. The neck pain at times radiates to the back of his head and from there to the front of his head and gives him headaches. He describes these headaches as dull to sharp, nonthrobbing, and associated with nausea at times. He says that he gets headaches frequently, almost every day, and a headache may last up to four to five hours.

As to objective findings on examination, however, Dr. Sharma observed:

> . . . There is tenderness to palpation of the cervical and paraspinal areas, with pain on forward flexion from chin to chest. No paraspinal muscle spasm noted. There is no hypertrophy of the neck muscles.

Dr. Sharma did not mention any objective findings of neck pain or related problems in his final impressions or functional capacity assessment.

---

[6]   In fact, a September 26, 2003, progress note from SCHC indicates: "[Plaintiff] was diagnosed as having degenerative joint disease, which he does have to a very mild extent."

**B.    Plaintiff's Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

The ALJ summarized plaintiff's testimony as follows:

> The claimant testified, through an interpreter, that he last worked in February 2003.  He stopped working due to dizziness and gout.  He said that gout medication helped, but didn't eliminate the attacks all together.  He said that he had trouble standing when he became dizzy.  He also stated that he had constant hip pain when standing.  He said that he could stand or walk 10 to 15 minutes at a time.

As to plaintiff's credibility, the ALJ stated:

> The claimant has alleged severe limitations in sitting, standing, and walking due to pain.  He has also alleged dizziness and severe headaches.  The claimant's sister also said that he cannot sit for prolonged periods and must change positions frequently.[7]  However, these allegations are not credible for the following reasons.
>
> The record shows that the claimant has had only routine treatment for his various impairments.  Although he sees a doctor regularly, the only treatment provided is medication.  The claimant has not been referred for more extensive treatment or diagnostic evaluation.  He has not been referred to a specialist or to a physical therapist or for other alternative treatment.  The clinical findings by treating sources and Dr. Sharma have been essentially normal.  Although there was some evidence of gout, this improved with proper medication.  Although the claimant alleged hip pain, he had good range of motion and no strength or neurological deficits.  He had few complaints of headaches, and no symptoms of migraines.  The record provides no ongoing significant complaints of dizziness.  In addition, the claimant's activities of daily living include many light activities such as cooking, household chores, gardening, and shopping.  The record also shows that the claimant watches television for prolonged periods, which requires extensive sitting.  Thus, the record supports a conclusion that the claimant can perform light work.

Plaintiff argues that "[t]here is nothing in the record to support the ALJ's conclusion that Mr. Anousaya's testimony was not credible or that his daily activities evidence an ability to engage in substantial gainful employment."

The court disagrees and finds that the ALJ's analysis is supported by substantial evidence and proper legal analysis.  In particular, plaintiff's daily activities of taking care of his 5-year-old grandson, walking outside, watching television, cooking for the family, gardening, and cleaning the house in the mornings all demonstrate an ability to perform light work.  Moreover, as discussed above and again below, plaintiff's complaints are not supported by the medical evidence.  Because the ALJ cited such factors as the claimant's daily activities and physician records about the nature, severity, and effect of symptoms, the ALJ did not err in his credibility analysis.  See id.

---

[7]     It was actually plaintiff's daughter – not sister – who testified.  Plaintiff raises no arguments concerning his daughter's testimony.

14

1

2

3

4

5

6

7

8

9

10

11

12

### C.   **Plaintiff's Severe Impairments**

Plaintiff argues:

> In his step two analysis regarding Mr. Anousaya, the only "severe" impairments the ALJ included were traumatic arthritis and mild degenerative joint disease, intermittent gout, and hypertension.  He failed to include:  severe, chronic, and frequent headaches and neck pain (TR 104, 112, 118); cervicogenic pain (TR 112); possible carpel tunnel (TR 185); severe language barrier (TR 111, 114, 115, 116, 117).

> As a result of the ALJ's failure to fairly evaluate the evidence and develop the record, he seriously, and unlawfully, circumscribed Mr. Anousaya's claim.  Because he failed to include all Mr. Anousaya's symptoms at step two, he failed to evaluate the many disabling symptoms which flowed from his diagnosed impairments, including:  his severe left hip pain (TR 99-103, 107, 112, 118, 142, 178, 183 185, 188); severe, chronic, and frequent headaches and neck pain (TR 104, 112, 118 185); dizziness (TR 104, 212); blurring of vision (TR 104); low back pain (TR 104; 112, 118, 185); possible carpel tunnel (TR 185); nausea (TR 104); pain in lower extremities (TR 104); intermittent numbness in lower extremities (TR 104); severe language barrier (TR 111, 114, 115, 116, 117).

13  Plaintiff does not provide any analysis in support of the foregoing allegations.  Rather, plaintiff

14  cites to various cases and makes the conclusory statement that the ALJ failed to consider all of

15  his severe impairments at step two.  Plaintiff does not explain how the ALJ failed to comply with

16  applicable law.

17       In order to be entitled to benefits, the plaintiff must have an impairment severe

18  enough to significantly limit the physical or mental ability to do basic work activities.  See 20

19  C.F.R. §§ 404.1520(c), 416.920(c).[8]   In determining whether a claimant's alleged impairment is

20  sufficiently severe to limit the ability to work, the Commissioner must consider the combined

21  effect of all impairments on the ability to function, without regard to whether each impairment

22  alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

23

24       [8]      Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25  carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with
26  changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908.  The plaintiff's own statement of symptoms alone is insufficient.  See id.

In his motion for summary judgment, plaintiff lists the following impairments which he says should have been considered severe:  (1) headaches and neck/cervicogenic pain and related headaches, blurring of vision, nausea, and dizziness;[9] (2) language barrier; (3) left hip pain; (4) low back pain; (5) possible carpel tunnel; and (6) pain and numbness in lower extremities.  Even though plaintiff's motion is conclusory on this issue, the court will nonetheless analyze whether the portions of the record cited by plaintiff support his contentions.

1.    Neck/Cervicogenic Pain and Related Problems

As discussed above, the ALJ correctly characterized the medical evidence relating to plaintiff's complaints of neck/cervicogenic pain and related problems of headaches, dizziness, nausea, and blurred vision.  The portions of the record cited by plaintiff all relate to plaintiff's subjective complaints and do not point to any objective findings.

2.    Language Barrier

Plaintiff argues that he is illiterate in English under 20 C.F.R. § 404.1564 which defines illiteracy as the inability to read or write a simple message such as instructions or inventory lists even though the person can sign his name.  The court does not agree.  The record

---

[9]    Both the record and plaintiff's brief indicate that headaches, neck pain, cervicogenic pain, blurring of vision, nausea, and dizziness are all related.  These will, therefore, be discussed together.

reflects that, in plaintiff's disability report, plaintiff indicated that he cannot speak English, but that he can read "a little bit" and write more than his name.  Plaintiff also indicated that he took English language classes at Shasta College in 1996.  Additionally, plaintiff's attorney at the time submitted a letter to the ALJ on July 7, 2004, in which he said:  "[Plaintiff] had some education in Laos and can understand some English."  In the daily activities questionnaire completed by plaintiff's daughter, she stated that plaintiff likes to watch television with his grandson, that they watch the History Channel and Cartoon Network – both broadcast in English –  and that plaintiff sometimes remembers shows after he watches them.

　　　　　Regarding plaintiff's English language abilities, the following exchange took place at the hearing:

　　　　　Q:　　Okay.  Mr. Anousaya, I know you've lived in the United States 15 years.  I'm still not real clear what your language capabilities are.  I think you understand simple English, correct?  You can understand simple conversation between people, is that correct?

　　　　　A:　　Yes, he can speak (INAUDIBLE).

　　　　　Q:　　When you were in the Untied States did you study English as a second language, did you go to school?

　　　　　A:　　Yes, I went to school but I didn't have much time because I worked at night time.

In the hearing decision, the ALJ observed:

　　　　　1.　　[Plaintiff] can speak, read, and write a little English;

　　　　　2.　　Although the claimant could speak some simple English, it was not sufficient to perform [psychological] testing tasks, and interpretation was too difficult; and

　　　　　3.　　[SCHC records] noted that [plaintiff] was from Laos but spoke some English.

/ / /

/ / /

/ / /

17

Based on the foregoing, the ALJ properly concluded:

> . . . Although the claimant has some difficulty with the English language, it is found that he is not illiterate as defined in the regulations.  He can read and write simple lists and can understand simple English.  It is found that he has the residual functional capacity to perform light work that can be performed by an individual with a limited command of the English language.

### 3.    Left Hip Pain

As discussed above, the ALJ concluded that plaintiff's left hip degenerative joint disease was, in fact, a severe impairment.  Thus, there simply is no basis for plaintiff's contention that the ALJ failed to consider plaintiff's hip problems to be severe.[10]

### 4.    Low Back Pain

Again, plaintiff cites to Dr. Sharma's report in support of his conclusory contention that the ALJ erred in not considering his back pain severe.  As discussed above, Dr. Sharma did not find any objective indications of severe back pain.  Plaintiff also cites to a portion of a <u>psychological</u> evaluation prepared by Dr. Kahler, who noted plaintiff's subjective complaints of back pain.  Obviously, because Dr. Kahler was charged with evaluation of plaintiff's psychological status, he did not make any objective findings of back pain based on a physical examination.  Finally, plaintiff again cites to the SCHC September 26, 2003, progress note which documented plaintiff's subjective complaint of back pain, but found no objective basis for a severe impairment.

### 5.    Possible Carpel Tunnel

In support of his contention that the ALJ failed to consider this as a severe impairment, plaintiff cites to the September 26, 2003, SCHC progress note in which the doctor noted: "He may possibly have a carpel tunnel."  Plaintiff does not cite to any other medical source in support of a severe carpel tunnel impairment.  A "possible" condition plaintiff "may"

---

[10]    Plaintiff does not argue that the ALJ erred in concluding that this severe impairment failed to meet or medically equal an impairment listed in the regulations.

1  have certainly does not equate to a severe impairment supported by substantial evidence in the

2  record.  Moreover, there are no other records relating to a carpel tunnel impairment.  Therefore,

3  the ALJ was correct not to list this as a severe impairment.

4              6.      Pain and Numbness in Lower Extremities

5              In support of his contention that pain and numbness in the lower extremities

6  constitutes a severe impairment, plaintiff once again cites to Dr. Sharma's statement of plaintiff's

7  subjective complaints.  As to objective findings, Dr. Sharma stated:

8                  There is pain on flexion of the left hip at 80 degrees, abduction at 20
                   degrees.  Right hip flexion 110 degrees.  Knee flexion is to 135/135
9                  degrees bilaterally.  There is no crepitation noted on range of motion
                   testing.  There is no patellar instability.  Ankle dorsiflexion is to 20/20
10                 degrees, plantar flexion is 40/40 degrees bilaterally.

11  Other than for the hip, these objective findings do not suggest a severe impairment.

12         **D.     Hypothetical Question Posed to Vocational Expert**

13             Hypothetical questions posed to a vocational expert must set out all the

14  substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

15  Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

16  limitations, the expert's testimony as to jobs in the national economy the claimant can perform

17  has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

18  the ALJ may pose to the expert a range of hypothetical questions, based on alternate

19  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

20  determination must be supported by substantial evidence in the record as a whole.  See Embrey

21  v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

22             Plaintiff argues that the hypothetical questions posed to the vocational expert did

23  not fully describe his limitations.  Specifically, he argues the ALJ failed to include any

24  limitations for:  (1) sitting, standing, or walking for no more than 15 minutes; and (2) language

25  barriers.  As to the former, plaintiff argues that the ALJ's failure to include this limitation was

26  contrary to his hearing testimony.  As to the latter, plaintiff argues that the ALJ erred in

1  concluding that he could read, write, and understand simple English because there is no evidence
2  to establish "that Mr. Anousaya could read or write anything at all [in English]."

3          1.    <u>Sit, Stand, Walk Limitation</u>

4        Plaintiff argues that the ALJ's failure to include a limitation for sitting, standing,
5  or walking no more than 15 minutes at a time is inconsistent with his hearing testimony.  The
6  basis for plaintiff's allegation that these are severe limitations is his testimony.  In particular,
7  plaintiff does not point to any medical evidence that these are severe limitations.

8        At best, plaintiff's statement of daily activities supports a finding that plaintiff
9  cannot stand for "a long time."  There is nothing in plaintiff's description of his daily activities to
10  suggest a 15-minute standing limitation or any limitation on sitting.  No doctor has assessed such
11  a limitation.  In fact, the physical residual functional capacity assessment prepared by Dr. David
12  indicates that plaintiff can sit, stand, and walk for "about 6 hours in an 8-hour workday."
13  Plaintiff does not challenge this assessment.  Plaintiff's hearing testimony to the contrary is
14  simply not supported by the objective medical evidence.

15          2.    <u>Language Barrier</u>

16        As discussed above, the record amply supports the description the ALJ gave to
17  the vocational expert concerning plaintiff's English language abilities.  Specifically, plaintiff is
18  not illiterate in English and can read, write, and understand simple English.  Therefore, the court
19  finds that the ALJ did not err in describing plaintiff's language abilities to the vocational expert.

20

21  **IV.  CONCLUSION**

22        Based on the foregoing, the court concludes that the Commissioner's final
23  decision is based on substantial evidence and proper legal analysis.  Accordingly, the
24  undersigned recommends that:

25        1.    Plaintiff's motion for summary judgment be denied;

26        2.    Defendant's cross-motion for summary judgment be granted; and

1          3.      The Clerk of the Court be directed to enter judgment and close this file.

2                  These findings and recommendations are submitted to the United States District

3    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

4    after being served with these findings and recommendations, any party may file written

5    objections with the court.  The document should be captioned "Objections to Magistrate Judge's

6    Findings and Recommendations."  Failure to file objections within the specified time may waive

7    the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9    DATED:   June 14, 2007.

10

11                                              _____
                                                **CRAIG M. KELLISON**
12                                              UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26